Good afternoon. Illinois Appellate Court First District Court is now in session. The First Division, the Honorable Justice Michael B. Hyman presiding, case number 1-9-2-3-5-0, Southwest LLC versus Fifth Third Bank. Good afternoon. First, I want to apologize for being a little late. We had a little glitch, but we're here. And so I would ask the both consuls, please introduce yourself. Thank you, Your Honor. I'm Jay Chambers. I'll be arguing for the Appellate West LLC. Thank you. Good afternoon, Your Honors. Andrew Cassidy for Defendant Appellee, Fifth Third Bank. Thank you. So you each have 20 minutes, Mr. Chambers. You can reserve part of your time for rebuttal. If you don't need to use all your time, but if you do, and usually we ask quite a few questions, you can continue to answer until you've made your points. But usually 20 minutes is about right. Thank you, Your Honor. I'd rather say five for rebuttal. Okay. Thank you. All right. Please proceed. Oh, just one other thing. We will handle this as if you were both in a courtroom. So we will interrupt. Finish your thought because in this day and age of technology, it's probably a better idea. And then please answer our question. Yes, Your Honor. May it please the court. If you've ever worked in a building with a defective HVAC system, you don't need any special training to know that there's something wrong. You know, in the summer, because you're sweating, you know, in the winter, because you can see your breath. Here, the Appellee, Fifth Third Bank owns a building with a defective HVAC system for nearly 10 years. And its employees knew about the defects the same way anybody knows about an HVAC system. Well, wait a minute. If that was true, then why did it take you four or five years to recognize that? Your Honor, it didn't take four or five years to realize there was an HVAC defect. As soon as my client moved into the building, they had the same problem. The delay was, my client was unaware that Fifth Third knew about the defect beforehand and failed to dispose of it. What's the defect you're talking about? Your Honor, it didn't work right. It didn't cool in the summer. It didn't heat in the winter. Well, my understanding from the evidence is it did. They had some problems. Yes, that was something that was mentioned, but they had constant regular maintenance. And in 2008, what they did was to have a review for some options, proposals, which didn't say that they had to start over. They just continued doing maintenance, which is apparently what you did after you took over the building. Well, Your Honor, I'd say that they didn't really continue doing maintenance for very long. As soon as they got those reports, they decided it was time to switch buildings. They built a brand new branch right there in the parking lot of the old one. Well, wait a minute. That's not what the quite thoroughly. And there were various banking regulations and customer factors. And this was not a one-off. This was a decision on several buildings that they own to reduce their size. And that's what they did. And they did it on the lot next door. Where do you have any evidence that it was done because of the HVAC? Your Honor, I think the timing is circumstantial. So all you have is a timing. Is that it? Well, that's not all I have, Your Honor. Besides the timing. But as far as the specific decision to move, we only have the timing. But that's what you just said. You just said it was a decision to move and I asked you for your evidence and it all has to do with the timing. In the timing, there is no evidence that it was other than the way I had just described it. Is there? Well, I would disagree that circumstantial evidence is an evidence. But I think the timing is the evidence, Your Honor. I think we agree on that point. But there's not another evidence. I don't agree that that's the evidence. I mean, there is timing. But there was no circumstantial evidence. But all the testimony contradicts that circumstantial evidence, doesn't it? I know, Your Honor. I don't believe it does. I think you also have probably the most obvious evidence is that the whole time the bank was there, the employees were complaining. A couple of times a month, somebody said it was too hot in the summer. In the winter, the employees of the bank, the third employees were all huddled around just to stay warm. I think that's the exact kind of evidence that anybody has or the defect in their HVAC system. It's how I know I have a problem at my house. When it's hot inside, I know the HVAC isn't working. I don't need the person to tell me the HVAC is broken. I hire an expert to fix it. But I don't need an expert to tell me there's a problem. What significance is it that they bought the building as is? Legally, I don't think there's any significance at all. So that's a meaningless term? Well, I think it's not contractually meaningless, but I don't think it gets you around a consumer product claim. I think the case law is pretty clear in the Bauer case that even if you have a consumer product, there's a duty to dispose known defects. Now, this is an unknown defect, and I think maybe the consumer product or maybe the as-is clause could be an issue. But under the consumer product, you still have to dispose a known defect, Your Honor. And what was the known defect? The known defect is that the heating system didn't keep the bank warm and the air conditioning didn't cool it. It didn't work properly. Your Honor, it's not just that. There's the evidence of that because when you look at the testimony with regard to 2008, and there was a lot of testimony about what happened in 2008. And they said that there is no evidence that the system was beyond repair or in need of replacement. What they said was it was repairable. It was functioning with proper upkeep. It said they did preventative maintenance. They had a shopping list and several other along the same lines. I didn't see in reviewing the record any testimony that said other than that. Well, Your Honor, that's the testimony of Walter Schroeder, which we cite in the first section of our act. He's the HVAC technician who was assigned to the building for essentially the whole time that the bank was there. There was a period from 2002 to 2004 that he didn't work with the property management company. But other than that, he was there. And Mr. Schroeder's testimony is that the employees were always, it was always too hot somewhere in the summer. And it wasn't just complaints. There was constant major failures of major systems. Then why is that? Again, you're saying it was defective as you just defined it for Justice Pierce. Apparently, everyone agreed that testified on the 2008 reports that it was repairable and was repaired and was maintained. And in fact, you didn't do anything about it until four or five years afterward. So if it was that condition, I don't think you would have waited that long, would you? Your Honor, I think that an employee of the law firm has been complaining constantly. Where's that in the record? There's testimony. We don't cite it as much in our brief because it's the post-sale conditions. So we're not going to be taking account of. So is that what your claim is? No, Your Honor. Well, I don't think it proves the bank knowledge necessarily. I think it proves that it was defective. If it doesn't prove knowledge of the bank, then why even mention? Well, I think it does prove the defect, that as soon as the law firm moved in, the HVAC system never comes in. Employees are always too hot and they're always too cold. Counsel, doesn't your argument go more to the fact that the employees perhaps were unhappy that this wasn't the coldest building in the world in the summer or the warmest building in the winter? It worked. It worked. It worked for you. It worked for your client. Your client didn't do anything for a couple of years. Do you expect that the air conditioning and the heating system is going to never, at any point in time, ever going to have to be replaced? Is that the standard that you believe should apply here? No, I don't think that's the standard, Your Honor. But I think the bank knew in 2008 that it was already time to replace it. And I think you'd see that in Mr. Romanowski's book. Okay, but then how do you explain it wasn't replaced until 10 years later that nobody really thought seriously about doing that? Well, the 10 years, most of that time, it was empty. In 2008, when the bank got these reports, they moved out before the summer of 2010. So for 2010, 2011, 2012, 2013, the bank was empty. There was nobody in. The HVAC system was on standby. So it wasn't 10 years. What about 13 to 17? Well, 13 to 17, it didn't work properly. The employees were complaining the whole time. My client hadn't made a decision to sue at that time. But there's no evidence that it ever worked properly. The evidence is to the contrary. What do you think properly means? I mean, it shouldn't be breaking down properly, which is another thing you see. It's an old building. It required maintenance. It got maintenance. It was more than maintenance. You had the same contractor working on it as the prior tenant. Right, Your Honor. And I think that contractor in 2017 said the system is long past the useful life. He said this was a long time coming. Right, that's in 2017. Right. And if it was long past its useful life in 2017, I think a reasonable fact finder could conclude it was also past its useful life in 2013, especially given the history of all the problems the bank had before it sold the building. I mean, there was a dozen major failures. There was five to eight times that the boiler went out. The chiller, the heart of the air conditioning system went out twice. While the bank owned it, the air handler's motor burned up. There were two different compressors. One time the air conditioning was down for a week. If you take that and you add it to all the testimony from Mr. Schroeder about the constant complaints from the bank employees, this is a system with defects. No, let's stop there because the town of Cicero, if they thought that, they would have done something else. And as you know, the defendants put $130,000 in escrow and there were reports Cicero said everything's fine and it can be repaired. And I think around $30,000 was used to bring it up to what was needed in order for the closing. So for you to say that there was a defect, if there was so defective, how did they get the permission of the town of Cicero? That's part of the evidence. Your Honor, the town of Cicero, there's a testimony in the record from Veronica Chavez, the town inspector. The town wasn't looking for a system that was free of defects. The town was looking for a system that would start. And I think, I mean, I would agree that the heating started before the sale. Now I will say that at the time of sale, it was impossible to assess the air conditioning. It had been down for several years at that point. And the West Town engineer who gave the certification specifically testified that it, or he had testified, his report said it was impossible to assess the system until the spring. Now they came back in in the spring and in June, they were able to start the system. But that's all that, that's all the report says. You had an opportunity for 45 days of due diligence. And my understanding from the record is you did not do any due diligence. Is that correct? Your Honor, I don't know if any was done. I will say that there was not. Is there anything in the record that says you did any due diligence? Yes or no? No, Your Honor, but I think I'm... So there's no due diligence done. So you had 45 days to check whatever you wanted, and you could have said right then and there, we're not going ahead. Okay. You didn't do that. So let's just start with the contract claim. Are you conceding that because of the add is clause that that claim is dead? No, Your Honor. I don't think the add is clause relieves them of their obligation under the contract. Why not? Only because of the so-called engineering report. So that's exactly right, Your Honor. Then the question is whether we have an engineering report. Tell me why that what we have is an engineering report. Just because the author of one of the reports said it was. Mr. O'Brien, the ThermFlow representative who worked on this report was asked directly, does this constitute an engineering report? He said the answer is yes. And he went on to say... Everybody else said... But if you look at what others say and the fact of what it is under and how everybody reacted to it, this does not appear to be an engineering report in substance. And whether he characterizes that or not is not the sole criteria for determining that it's an engineering report, is it? I think it's enough for a fact finder to make that conclusion. Yes, I do, Your Honor. And I also think that the notion that there's something inconsistent with an engineering report also being a proposal, which seems to be the argument that it's not an engineering report, it's a proposal. I think it's pretty clear that these documents both think. Well, the other people who did the reports, they disagreed with that. They didn't say... None of them said it was an engineering report. I think Tom Fiedler, who did the Westtown report, testified that they had to hire an engineer. Well, hiring an engineer does not make it an engineering report. I'll concede, an engineer can work on something. That doesn't make it an engineering report. I think it does when you have the testimony from Tom Fiedler that the engineer's report became part of the proposal, that it became part of the Westtown report. So you're saying it was a proposal? I think it's both, Your Honor. I think that's my point, is that I think it can be a proposal and an engineering report. And I think there's multiple cases. We've got the City of Elgin case, the Balton case. Both of those cases in our brief involved engineering reports that were made in conjunction with works that was proposed. I don't think there's any... So what is the difference between a proposal and an engineering report? I don't think there is one, Your Honor. I really don't. That's interesting. Yeah, I think a proposal can be an engineering report. Okay, what's the difference between those two things and just a quote that you get over the telephone? I don't think you hire an engineer to help you do a quote over the telephone. You know, if I was pricing out new carpet, I don't think an engineer would be involved. Wasn't Fiedler's testimony more along the lines of, you know, if you accept our proposal and this work needs to be done, we're going to have to consult with an engineer. I don't know that... That's Mr. O'Brien's testimony, and he was the representative. O'Brien, I'm sorry, I misspoke. Isn't that... You said before that O'Brien said it was an engineering report, correct? Yes, Your Honor, but his testimony was... But he didn't exactly say that, did he? Well, he did directly. The question was, in your view, does this constitute an engineering report? He said yes. Well, didn't he say because it's done, they're going to have to consult with an engineer? Well, I think he also said these are our thoughts in engineering, is how to fix this building properly. I think whether these are engineering reports or... Fix it properly, if you fix it, if you accept the proposal. Yes, Your Honor, I agree. It's an engineering report that reflects proposed work, but I don't see anything in the contract. I mean, the bank wrote this contract provision. They could have defined engineering report to exclude engineering report. Well, you could have done the same thing, but you didn't. Well, I don't think we needed to, Your Honor. I think engineering report encompassed... I think that there would have to be an exclusion of proposals for if it documented both an engineering report and a proposal, you don't have to produce it. Anything else you wish to add? No, Your Honor, I'll save my time for rebuttal. Thank you very much. Mr. Cassidy? Good afternoon, Your Honors and counsel, Mr. Chambers, please, the court. Justices Hyman and Coughlin, I think we're hitting the nail on the head on a key issue in this case, which is what is the defect that has been litigated? What is the defect that has been pled? The defect alleged by Southwest was not generic failures to heat or failures to cool over the years. It was very specific and they were tied exactly to the 2008 quotes submitted by both Westown and ThermFlow. The case that has been litigated up to this point, up until Southwest Supply Reef was not... The HVAC was having issues. And the reason it was not that is important, Your Honors. Number one, nobody in this case testified that the routine repair and maintenance that Fifth Third did over the years was in fact extraordinary for an HVAC system of that age. It was routine repair and maintenance. There was no evidence submitted at all in this case that the routine repair and maintenance Fifth Third did went above and beyond what an ordinary buyer would expect for an HVAC of this age. Number two, Your Honors, Mr. Chambers noted the deposition testimony of Walter Schroeder. He was the Vioxx technician. And this is the evidence Southwest offers in its reply group to show that there was in fact a defect. He was asked point blank by West Council at his deposition, was this a consistent complaint? The complaint meaning not too hot, not too cold. Was this a consistent complaint from the employees during the time you worked at the building? No. How frequently was it a complaint? Quote, it was on and off. I mean, when you get to 102 or 101 degrees, it gets hot in there, but that was just like any place else. The West Council followed up with another question. So while the building was occupied by the bank, how frequently would employees complain to you a couple times a month? Question. What was your impression of the building in terms of the HVAC system? Answer. The building actually ran pretty decent for the size of the building for what they had in the age of the equipment. But I mean, everything works. So number one, the testimony does not establish material HVAC defects, but a more important reason why this was not the allegation and this is not the case. It's been litigated up to this point. I'm sure Your Honors know the ICFA has a three-year statute of limitations. Admittedly, there's a discovery rule that's triggered upon a buyer having a reasonable notice of an issue. And as Mr. Chambers points out in his brief, and as he reiterated to you at argument, these problems, according to Syl West, started right away. They had a report from before they moved in identifying $30,000 worth of had verified that the AC was up and running properly. He noted in a repair order, quote, repairs will be necessary. Now Syl West uses this in their briefing as evidence of some defect, but all it does is doom them from a statute of limitations standpoint. But that's why this is not how this case has been litigated. The allegations in the Second Amendment complaint and the representations made in all the briefing throughout the trial court and in front of this court were the HVAC needed the work outlined from these four and a half year old proposals in order to operate properly and without which the system was defective. So that that is really the correct lens. That's the material fact, which Syl West claims fifth or concealed was that the HVAC needed basically a complete overhaul in order to operate properly. And as you point out, there's really no evidence of that. We cited, Your Honors, a lot of deposition testimony in our brief. And I know the factual record is quite large in this case. And I'd be happy to reiterate some of the direct Q&A, which we submit, answer this case beyond a shadow of a doubt. But we asked the West Town and ThermFlow witnesses point blank, not just in a vacuum of what was the state of the HVAC at the time, but within the specific confines of Syl West's theory. If Syl West had called you up in 2013 before they moved in, they found this letter that you wrote back in 2008. Is this evidence that the work needed to be done? No. Their answers and their testimony was as conclusive as you can possibly get. What about his argument going a little different area, but about the engineering report? He says all that testimony with regard to what was done in 2008 indicates that several individuals felt that this was an engineering report as a matter of what was presented to the bank. Thank you, Justice Hyman. And so that's going more to reach a contract question. And I think it's an important distinction. I think, Justice Hyman, if I recall correctly, you were the one who made this point. Keith O'Brien's deposition testimony about whether a particular document falls within the meaning of a contract provision between two other parties cannot control. He's not a party to the contract. Interestingly, Tom Fiedler of West Town point blank was asked, is this an engineering consultants report? Fifth Third Council, my colleague, asked that question. So West Council interrupted, objected and said objection calls for a legal conclusion. Now, of course, Tom Fiedler said in no uncertain terms, no, this is not an engineering consultants report. But my point being, this court can and should, as a matter of law, interpret the meaning and effect of a contract term. Courts do that every day to the extent that a third party's deposition testimony such as Mr. O'Brien can have any weight at all to whether a particular document falls within the meaning of a contract term between two other parties. Justice Coughlin, you hit the nail on the head. He said it was only an engineering consultants report to the extent we get that anyway, to the extent that if the proposal was accepted, they would have to consult an engineer to make sure the brand new yet existing equipment was installed safely in the premises, which all circles back to the question that I think this court can answer, which is is a engineering consultant report accepting that for equipment which doesn't even exist in the building as of the current date, something that falls within the ambit of these due diligence documents. I think in the context of that provision, you look at some of the other things that were required by that particular paragraph of the contract, environmental reports, soil studies, title insurance policies, appraisals. None of these documents are seeking documents for future things that don't exist yet. So West wasn't asking for appraisals based on property that Fifth Third had not yet acquired. They weren't asking for hypothetical environmental studies. This provision, understandably, I think by common sense, sought documents describing the current state of the HVAC because obviously that's what any buyer cares about is what's in there now, not what's in there later. I think an appropriate analogy, Your Honors, is if you have a 15-old vehicle that you're selling as part of an as-is sale, at some point in the life of the vehicle, you go, I don't like doing this maintenance and routine repair and maintenance as much. Why don't I get an MSRP on a brand new car? The car comes back. You decide from a business judgment standpoint, you don't want to pay for a new car. So you decide, maybe I'll do that down the road when I have the cash. But for now, my car operates properly. You then sell the car in an as-is sale, and the buyer complains because years later, you didn't provide the MSRP that you'd gotten five years prior. So the engineering consultant's report testimony by O'Brien, I think, is kind of a red herring. I think this court can and should, as a matter of basic contract interpretation, ask whether an engineering consultant's report for equipment which doesn't even exist yet is something that would have been sought by this contract. Mr. Cassidy, how do you respond to counsel's argument that Fifth Third moved as received this information? Sure, Your Honor. First of all, I disagree that it was as soon as the- I'm paraphrasing, but- Sure. I appreciate it. I was more direct in that, Mr. Chambers, characterization. They got the quote, the first quote was received in May of 2008. Fifth Third moved nearly two years later, in April of 2010. So it wasn't right away. And to the extent that we initially started this conversation about what the material fact at issue is in this case, because Fifth Third submits, the trial court didn't reach this conclusion. The trial court rightly found that there was no evidence Fifth Third knew of the requirement that the HVAC be overhauled at the time of the sale. But the actual material fact, which Shoalwest has to marshal evidence of, is that the HVAC required the work outlined in the proposals at the time of the sale. We submit that's flat out not the case. The timing of Fifth Third's move only goes to this knowledge intent to deceive element. I don't even think we need to get there. But if we do get there, Justice Coghlan, just because one event happens sooner in time than another, doesn't mean the first caused the second. Shoalwest, Fifth Third moved out two years after the first quote was submitted. Well, they really didn't wait because you don't move until you have plans and construction. So actually what Mr. Chambers is saying, it appears under the circumstance to be accurate in that soon afterwards, a decision was made and then they have plans and they went ahead and built a building next door that they then moved into down the road. So, and it came very shortly after this report. Thank you, Justice Hyman. That's fair, but in the context of their fact and piece of testimony in this case, this is not even a weighing of the evidence. The question that has to be asked, is there a reasonable inference? Because it's not a fact, is there a reasonable inference to be drawn by the fact that Fifth Third moved shortly after, within some period of time after getting these quotes? And I think the answer is clearly no. Number one, the witnesses were asked point blank at their depositions, why did you move? For downsizing reasons. They wanted to move from a 20,000 square foot building to a 4,000 square foot building. Number two, again, So West's entire theory is that Fifth Third moved because of these quotes. And because we, So West, say that these quotes mean that the entire HVAC had to be overhauled, Fifth Third went through a mental calculus to say, well, gee whiz, I've been told the HVAC needs to be completely retrofitted instead of doing that, I want to move. The problem is that interpretation by So West is completely refuted, not just by the authors of those are proposing them as mere options for potential budgetary consideration in the future. We never intended them to mean that the work was required, and by the way, the work was not in fact required. So, So West's leap of conclusions here would require Fifth Third to reach a conclusion that was disavowed by the people who wrote the documents, when nobody else, not a single other person in this case testified, they believed the work was in fact required. We asked Vioxx, the Facilities Maintenance Manager, did you believe that the work was required in 2008? No, they believe it could continue with routine maintenance, as did ThermFlow, Kevin O'Brien, as did Westown, Tom Fiedler, as did Westown, Freddie Romanowski, as did, by the way, Town of Cicero's employee, Veronica Chavez. We asked her, point blank at the deposition, was there anything that you learned from Westown, including the time of sale certification, which I would submit, we haven't really talked too much about that, your honors. I know we made a big deal about that in our briefs. I would submit that the time of sale certification by Westown, certifying the status of the HVAC at the time is more conclusive than any other years later deposition testimony in this case, and it was not merely a check in the box exercise. It had substantive intelligence on the HVAC, the different components of it, and it went so far as to identify $30,000 worth of repairs, which fit their escrow money for, but those repairs were not the repairs SoWest now claims allegedly were required four and a half years before that time of sale certification. So in any event, I think that time of sale certification governs, but my point being, we asked Veronica Chavez, is there anything that you interpreted in any of these documents as meaning that the HVAC needed this overhaul? So SoWest's timing argument and the inferences that would have to be gleaned from it would require Fifth Third to divine some knowledge about the HVAC system not believed by the very people that author the documents, let alone anybody else who testified in this case. Your Honors, real quickly on the knowledge point, I see my time is almost up. Again, we believe that there's no evidence of the material fact alleged to have been concealed in this case. Your Honors, just last week in the Chicago Retirement Authority employee case said that summary judgment is kind of a put up or shut up time where you have to marshal evidence to support your claims. There is not a shred of evidence in this case that the material fact which SoWest claims that they're concealed at the time of the sale actually existed. The time of sale certification refutes it. The deposition testimony by the very people that wrote the documents refute it. Summary judgment should be affirmed without even getting any further. But assuming you go to this knowledge prong, which is really where the trial court went, again, I don't think there's any plausible or reasonable inference to expect Fifth Third, who is a bank, to have leaped to a conclusion not only completely contrary to what the expert who, as Justice Coghlan noted, serviced the building for Fifth Third and then for SoWest for years, a conclusion contrary to not only what they came to at the very time of the sale, but a conclusion contrary to how they interpreted the very own documents that they wrote four and a half years prior and to which they testified to. So there's simply no evidence to support the material fact that was alleged, let alone any evidence Fifth Third knew of this supposed defect. And I want to close with one final thought, Your Honors. SoWest, in this case, shortly before trial, moved in Lemonade to prevent Fifth Third from talking about its lack of due diligence, the fact that it blew through its 45-day due diligence period, the fact that despite having a commercial appraiser tell them, hey, go have a comprehensive check of these HVAC systems done, which they didn't do, they moved to prevent Fifth Third from introducing evidence of that. And in their motion in Lemonade, this is record site C-3597, Volume 5, SoWest argued, there is no evidence in this case that SoWest LLC, had they hired an engineer to inspect the HVAC system, that he or she would have uncovered the hidden or latent defects that resulted in the complete failure of the system. I mean, that is the entire gist of this case. We submit the material fact they need to prove is flat out untrue, no evidence of it. But if even SoWest, had they hired their own engineer, couldn't have gleaned the need to overhaul the HVAC at the time, nor could Fifth Third. Fifth Third deferred to Westown, who the town of Cicero deferred to, who Vioxx referred to, deferred to, excuse me, and who SoWest then trusted for years with its own maintenance. So we would submit that SoWest has not come forth with any evidence sufficient to raise an issue of material fact. And we believe that the trial court got its decision correct. And we would respectfully ask this court to affirm the summary judgment decision in favor of Fifth Third. Thank you, Mr. Cassidy. Mr. Chambers, in your rebuttal, I would request that you begin by responding to the last comment, specifically with the motion in Lemonade, in that statement that was just read by Mr. Cassidy. What's your response? Your Honor, I don't think it's uncontroversial to say they wouldn't have found the specific problem. It was the air condition that exploded in 2017. And the Westown certification to Cicero said during the due diligence period, it was the explosion that was that what that what that didn't sound like that the idea behind that motion in Lemonade had to do with due diligence. Okay. And you're saying you wouldn't have found anything. I'm saying I wouldn't have found air conditioning problems because the Westown representative said it was impossible to assess the air conditioning at that time. You had to wait until the spring. But during the due diligence period, the Westown report, the town of Cicero said you can't find problems in the air conditioning system. You have to wait and start it up. So I don't think that's inconsistent. I'd like to respond very briefly to a couple of things. First, you mentioned the affirmative statute of limitations. They didn't move on that on judgment. They would bear the burden to prove that beyond all doubt. That's just not the evidence that's in the record right now. I don't think that's something the court should appropriately consider at all on this appeal. As far as the timing, I think the unanswered question here at the time is that, like, sure, the bank wanted to downsize. 20,000 square feet was too big. But it was perfectly happy in that 20,000 square foot building in 2001 when it got the building from Old Kent Bank. And it stayed perfectly happy. They never considered. And this is their testimony. They never considered downsizing or selling until 2009. And what happened in 2009, they had just gotten a report that said, if you want to keep this system running, then you're going to have to spend somewhere between half a million dollars and a million dollars sometime in the near future. You know, this building sold for $1.1 million. I think a reasonable tax finder could look at that time and conclude that the thing that changed from 2001 to 2008, when the bank was perfectly happy in this building, to 2009, when they suddenly wanted to downsize, is that the bank realized how much it was going to cost to stay in that building with a 100-year-old HVAC system. Well, the problem with that is that's, as you say, circumstantial evidence is speculation when we have actual testimony that says quite the opposite. I don't think there's any testimony that explains why they decided to downsize when they did it. I don't think there's any testimony. I think that's what was asked. I mean, that is the testimony. I think why did you move? And the answer is we wanted to downsize. And I don't think wanting to downsize is necessarily inconsistent with wanting to downsize because you found out how much it's going to cost to stay in this big building. I mean, the unrebutted testimony is they didn't want to downsize before they got these reports. Well, I was going to say, maybe. All right. I'll leave it at that. Yes, Your Honor. And I think the final thing is I think the analogy Mr. Cassidy made about a car can be useful, but I don't think the analogy is quite right. This isn't a case where you have an old car and go look for a new car. I mean, going and looking for new cars is something you might do because it's fun. It's fun to imagine yourself in a new car. This is not buying a new car. This is buying a new transmission. Buying a new transmission is something you don't do if the transmission you have is working properly. And I think if you had an old car and the transmission was constantly breaking down and you got tired of it and you went out and got a quote on a brand new transmission and you realized it was going to cost as much as the car was worth, and then you decided to sell the car for the first time, that's when you decided to upgrade. I think the fact that you were shopping for the transmission in the first place shows your knowledge of the defect of the transmission. And I think that's what we have here. It's something that's never been explained. Why was Fifth Third getting multiple quotes on a full system replacement if this HVAC system was working properly, if it wasn't time to change it? And in the system is past its running life. It's time for a full infrastructure upgrade. That's what the bank was shopping for in 2008. And I think the fact that they were shopping for that in the first place shows that the bank knew it was time to upgrade this system. Thank you very much. I want to thank both counsels. Your briefs were well presented and your arguments both were excellent and well prepared. So I appreciate that. We all appreciate that. We'll take the case under advisement and rule accordingly. Thank you very much.